IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

PHILLIP ALLEN LARUE            )
                               )
v.                             )        NO. 2:11-0029
                               )
CAROLYN W. COLVIN,             )
  Acting Commissioner of       )
  Social Security[1]            )


To: The Honorable John T. Nixon, Senior District Judge


## REPORT AND RECOMMENDATION

  The plaintiff filed this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the plaintiff's claim for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"), as provided by the Social Security Act.

  Upon review of the Administrative Record as a whole, the Court finds that the Commissioner's determination that the plaintiff is not disabled under the Act is supported by substantial evidence in the record as required by 42 U.S.C. § 405(g), and that the plaintiff's motion for judgment on the administrative record (Docket Entry No. 13) should be DENIED.

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is substituted for former Commissioner Michael J. Astrue as the defendant in this suit.

# I. INTRODUCTION

In October 2007, the plaintiff filed applications for SSI and DIB, alleging a disability onset date of July 15, 2000. (Tr. 10, 107-14.) He subsequently amended his alleged onset date to December 30, 2005. (Tr. 10, 33, 186.) The plaintiff alleged disability due to back pain, pain and numbness in his right leg, depression, mediastinal lymphadenopathy, and sarcoidosis lymphoma. (Tr. 38-41, 43-44, 119, 150.) His applications were denied initially and upon reconsideration. (Tr. 59-70.) The plaintiff appeared and testified at a video hearing before Administrative Law Judge ("ALJ") Joan Lawrence on November 4, 2009. (Tr. 28-50.) On January 25, 2010, the ALJ entered an unfavorable decision. (Tr. 10-22.) The plaintiff filed a request for review of the decision on February 13, 2010 (tr. 6), and on February 17, 2011, the Appeals Council denied the request for review, thereby rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-3.)

# II. BACKGROUND

The plaintiff was born on February 22, 1974, and he was thirty-one years old as of his amended alleged onset date. (Tr. 32-33.) He has a tenth grade education and has previously worked as a cabinet maker. (Tr. 32-33, 131-32, 140-41.) The plaintiff has not worked since 2000, and he was incarcerated from 2002 until 2006. (Tr. 33-34, 130.)

## A. Chronological Background: Procedural Developments and Medical Records

The plaintiff injured his back on the job in 1999. (Tr. 38.) An MRI of his lumbar spine taken on March 8, 2000, showed "good vertebral alignment" and "well preserved" disc spaces, but indicated a "[m]ild disc bulge at L4-5 which may be contacting the thecal sac anteriorly" and a disc

bulge at L5-6 with possible "disc extrusion toward the right side of the canal which may be contacting the right nerve rootlet behind the S1 vertebral body." (Tr. 206.) On referral from Dr. Richard Smith, an internist, the plaintiff consulted with Dr. Leonardo Rodriguez-Cruz, a neurosurgeon, on May 8, 2000, and reported that he had been experiencing low back and right leg pain for approximately six months. (Tr. 200.) Dr. Rodriguez-Cruz related that the plaintiff was in a "moderate amount of distress secondary to obvious leg pain with an antalgic gait" but that he maintained "normal range of motion of the lumbar and cervical spine;" "normal curvature of the cervical, thoracic and lumbar spine;" and "good range of motion of all joints of the lower extremities." *Id.* The plaintiff had a positive straight leg raise on the right side at sixty degrees, which was "made worse with dorsiflexion[2] of the right ankle." (Tr. 200-01.) Dr. Rodriguez-Cruz found it "noteworthy" that the plaintiff exhibited five out of five strength in all muscle groups in both of his lower extremities. (Tr. 201.) However, he also noted that the plaintiff had diminished ability to sense light touch over his right foot. *Id.* Dr. Rodriguez-Cruz believed the plaintiff was "very likely to require surgery at some point" and advised him to consider an epidural steroid injection. *Id.*

The plaintiff was given epidural steroid injections on May 25, June 9, and June 28, 2000. (Tr. 215-21.) Following the first of these injections, Dr. Rodriguez-Cruz examined the plaintiff on May 31, 2000, at which time the plaintiff reported that his pain level was a seven out of ten but had been as low as three out of ten immediately following the injection. (Tr. 198.) The plaintiff continued to have a "positive straight-leg raising sign on the right side at 60 degrees with Lasègue['s]

---

[2] Dorsiflexion is "flexion or bending toward the extensor aspect of a limb, as of the hand or foot." Dorland's Illustrated Medical Dictionary 560 (30th ed. 2003) ("Dorland's").

sign[3] present on dorsiflexion of the ankle." *Id.* On June 9, 2000, prior to receiving the second epidural steroid injection, the plaintiff reported 10% relief from pain and no new symptoms. (Tr. 219.) Prior to the third injection, on June 28, 2000, the plaintiff reported "near complete resolution of his low back pain" but continued leg pain to a "small degree." (Tr. 221.) After the injection, Dr. Rodriguez-Cruz expressed concern regarding the plaintiff's continued narcotic use and scheduled the plaintiff for a lumbar microdiskectomy.[4] (Tr. 197.)

The plaintiff visited Dr. Rodriguez-Cruz on August 14, 2000, to discuss his upcoming surgery and reported that he had "virtually no low back pain." (Tr. 196.) He continued to have right leg pain and had a positive straight leg raise at sixty degrees. *Id.* An MRI on August 17, 2000, showed "[v]ery mild insignificant disk bulge at L5-S1 posteriorly and to the right" and a "suggestion of a moderate focal disk bulge at T10 and T11 . . . probably not causing significant compression of the spinal cord or nerve roots." (Tr. 205.)

On August 19, 2000, the plaintiff was admitted to Fentress County General Hospital where he was treated for severe headache and fever. (Tr. 560-61.) Dr. Smith examined the plaintiff, who exhibited "difficulty ambulating" and complained of "upper epigastric discomfort" and a severe headache. (Tr. 562.) Results of a CT scan of the brain and a chest x-ray were normal, and a lumbar puncture revealed high protein levels. (Tr. 561.) Dr. Smith diagnosed encephalopathy,[5] headache,

---

[3] A Lasègue's sign is when "flexion of the hip is painful when the knee is extended, but painless when the knee is flexed. This distinguishes the disorder from disease of the hip joint." Dorland's at 1700.

[4] A microdiskectomy is the "debulking of a herniated nucleus pulposus using an operating microscope or loupe for magnification." Dorland's at 1151.

[5] Encephalopathy is "any degenerative disease or diseased condition of the brain and spinal cord." Dorland's at 610.

and degenerative disc disease of the lumbar spine.  *Id.*  On September 8, 2000, Dr. Rodriguez-Cruz performed a right L5-S1 microdiskectomy on the plaintiff.  (Tr. 209-11.)  During a post-operation evaluation on October 5, 2000, the plaintiff continued to have leg pain, but he demonstrated normal strength, sensation, and reflexes.  (Tr. 195.) Dr. Rodriguez-Cruz expressed concern that the plaintiff's radiculopathy[6] may have been left untreated for so long that permanent nerve damage had resulted.  *Id.*  He recommended physical therapy but expressed concern that, if it were unsuccessful, the plaintiff likely had "permanent radiculopathy and [would] necessarily be disabled to a certain degree because of it."  *Id.*

The plaintiff began physical therapy on October 18, 2000, reporting that his pain was typically a four out of five in the morning and a two out of five by late afternoon.  (Tr. 320.)  The physical therapist observed that the plaintiff used a "protective posture" and "movement guarding," and on exam, the plaintiff demonstrated five out of five strength on the left and greater than three out of five strength with positive straight leg raise at thirty degrees on the right.  *Id.*  The therapist's plan of treatment included physical therapy three times a week for four weeks and home exercises. *Id*.  After missing a physical therapy session scheduled for October 20, 2000, the plaintiff reported "less stiffness, little, if any, low back pain, and less [right] leg pain," and he demonstrated an increased stride during ambulation at his November 3, 2000 appointment.  (Tr. 321.)   On November 6, 2000, the plaintiff reported increased back mobility but was "still concerned over [right leg] radiculopathy."  (Tr. 322.)

On November 8, 2000, the plaintiff went to the Fentress County General Hospital emergency room because of back pain and left leg pain following a motor vehicle accident the previous day.

_____

[6] Radiculopathy is "disease of the nerve roots."  Dorland's at 1562.

(Tr. 500-04.)  He was given pain medication and discharged without being admitted to the hospital.

(Tr. 503-04.)  On November 15, 2000, the plaintiff returned to Dr. Rodriguez-Cruz, reporting that physical therapy had helped his low back pain but had not significantly helped his leg pain. (Tr. 319.)  The plaintiff's left side was normal, but he had "discernable weakness of the gastroc and soleus muscle on the right side." *Id.*  Dr. Rodriguez-Cruz believed the plaintiff to be "suffering from a chronic radiculopathy secondary to the longstanding compression of the nerve from having a disc herniation that went untreated for so many months." *Id.*

The plaintiff presented to Dr. William Leone of The Pain Management Group on December 5, 2000, reporting that he was experiencing pain at a four out of ten on the pain scale, that medication and physical therapy had been somewhat helpful, and that nerve blocks had not improved his condition.  (Tr. 324-25.)  The plaintiff exhibited decreased range of motion of his lumbar spine, tenderness in his low back, and pain on flexion.  (Tr. 326.)  Dr. Leone diagnosed chronic right lumbar radiculopathy and recommended a right L4-5 transforaminal epidural steroid injection. (Tr. 324, 326.)  The plaintiff was discharged from physical therapy on December 19, 2000, as a result of his "non-compliance."  (Tr. 212.)

The plaintiff received a steroid injection on December 20, 2000, and again on January 3, 2001, at which time he reported that he experienced "very good pain relief for approximately seven days" following the first injection.  (Tr. 330-35.)  During a post-operation checkup on February 19, 2001, Dr. Rodriguez-Cruz observed that the plaintiff walked without a limp, had normal strength bilaterally, and reflexes 2+ at the knees and 1+ at the ankles.  (Tr. 194.)  However, due to the plaintiff's continued pain, Dr. Rodriguez-Cruz suggested that a spinal cord stimulator might be needed and scheduled another MRI.  *Id.*  The following day, the plaintiff saw Dr. Leone for a follow-

up visit and reported a pain level of five out of ten.  (Tr. 337-38.)  Dr. Leone diagnosed the plaintiff

with lumbar radiculopathy and chronic low back pain and prescribed OxyContin and Percocet.[7]

(Tr. 337.)  An MRI on March 7, 2001, revealed "disc bulges at L3-4 and L4-5 producing effacement

of the thecal sac, but no nerve root involvement," "a laminectomy defect at L5 on the right," and an

area of "decreased signal anterolaterally in the spinal canal at L5-S1 level obliterating the S1 nerve

root on the right pre contrast" and "completely encas[ing] the S1 nerve root on the right" post

contrast.  (Tr. 202.)

   On March 16, 2001, Dr. Leone reviewed the new MRI results and determined that the

plaintiff was suffering from lumbar radiculopathy, lumbar degenerative disc disease, and lumbar post

laminectomy syndrome.  (Tr. 340-41.)  The plaintiff relayed that his pain level was a four out of ten

and that he was "overall doing about 50% better."  (Tr. 341.)  Dr. Leone increased the plaintiff's

prescribed dosage of OxyContin, decreased his prescribed dosage of Percocet, and prescribed

Vioxx.[8]  *Id.*  At his appointment with Dr. Leone on May 14, 2001, the plaintiff reported overall

decreased pain and increased function but also reported that he was experiencing "increased

numbness and weakness" in his right leg and that his pain level was a five out of ten.  (Tr. 343.)  He

also reported that he had discontinued Vioxx because it caused nausea.  *Id.*

   On June 6, 2001, the plaintiff reported to Dr. Leone that he had improved by at least 60% and

that his pain level was a seven out of ten but that he did not wish to proceed with the spinal cord

stimulator or surgery.  (Tr. 346-47.)  In a letter dated June 21, 2001, Dr. Leone opined that for

_____

   [7] OxyContin and Percocet are narcotic analgesics.  Saunders Pharmaceutical Word Book 524, 546 (2009) ("Saunders").

   [8] Vioxx is a nonsteroidal anti-inflammatory drug (NSAID) used to treat osteoarthritis and rheumatoid arthritis.  Saunders at 756.  Vioxx was taken off the market in September 2004.

workers' compensation purposes, the plaintiff had a "10% to 13% impairment of the whole person" and would benefit from work hardening and conditioning. (Tr. 348.) At his July 9, 2001 appointment with Dr. Leone, the plaintiff reported doing well on medications but relayed that his pain level was an eight out of ten. (Tr. 349.)

On August 31, 2001, the plaintiff presented to Dr. Leone, who observed that he "ambulate[d] well without difficulty and without a limp" but had limited range of motion of the lumbar spine. (Tr. 352.) At his September 26, 2001 appointment with Dr. Leone, the plaintiff's pain level was a seven out of ten and he had mild muscle spasms, but he demonstrated "[n]o point tenderness," "[g]ood flexion and extension of the lumbar spine," and "[g]ood lateral rotation." (Tr. 355.) Dr. Leone prescribed Flexeril for muscle spasms and Neurontin for bilateral radiculopathy,[9] reduced the plaintiff's Percocet prescription, and again prescribed OxyContin. (Tr. 356.) On November 11, 2001, the plaintiff reported that Neurontin was causing nightmares, so Dr. Leone prescribed Zonegran[10] instead. (Tr. 358-59.) Dr. Leone also scheduled the plaintiff for a lumbar transforaminal epidural steroid injection to address his right leg radiculopathy, which the plaintiff had on December 19, 2001. (Tr. 359-61.)

At his January 11, 2002 exam, the plaintiff reported that he had experienced 30-40% relief from the injection but that he had fallen and was experiencing increased mid back pain as a result. (Tr. 363.) Dr. Leone increased the plaintiff's Percocet prescription, prescribed Soma[11] in place of

---

[9] Flexeril is a skeletal muscle relaxant. Saunders at 294. Neurontin is used as an "anticonvulsant for partial-onset seizures" and as "treatment for postherpetic neuralgia." *Id.* at 488.

[10] Zonegran is a "sulfonamide anticonvulsant for partial seizures." Saunders at 780.

[11] Soma is a skeletal muscle relaxant. Saunders at 653.

Flexeril for muscle spasms, continued to prescribed OxyContin, and scheduled another epidural steroid injection. (Tr. 364.) Dr. Leone also discussed conducting a lumbar diskography[12] following the plaintiff's steroid injection in order to reevaluate his back pain and encouraged the plaintiff to increase his activity and begin working again. *Id.* The plaintiff received a right lumbar transforaminal epidural steroid injection on February 5, 2002. (Tr. 366-69.) At his follow-up appointment with Dr. Leone on March 4, 2002, the plaintiff reported a pain level of seven out of ten and was prescribed Zonegran. (Tr. 370-71.)

The plaintiff was also treated intermittently by Dr. Smith from July 2001 to January 2003.[13] (Tr. 237-42.) On July 2, 2001, the plaintiff demonstrated a steady gait and was assessed as having lumbar pain syndrome and anxiety. (Tr. 241.) On July 30, 2001, plaintiff received medication refills and was treated for open lesions. (Tr. 240.) At his August 27, 2001 appointment, the plaintiff again received refills and was also diagnosed with vertigo. (Tr. 239.) On February 9, 2002, the plaintiff reported having left hip pain, so an x-ray was performed, which revealed "no definite pathology." (Tr. 238, 242.) The plaintiff visited Dr. Smith again on January 23, 2003, after he "slipped and fell" and reported low back pain radiating down his right leg. (Tr. 237.)

On February 6, 2008, Dr. Jerry Surber, a Tennessee Disability Determination Services ("DDS") consultative physician, examined the plaintiff. (Tr. 260-65.) During the examination, the plaintiff was able to "perform the straightaway, tandem, and heel-toe walks" but had "limping,

_____

[12] A diskography is a "radiography of the spine for visualization of an intervertebral disk, after injection into the disk itself of an absorbable contrast medium." Dorland's at 545.

[13] It appears that Dr. Smith referred the plaintiff to Dr. Rodriguez-Cruz in May 2000 (tr. 200), and that Dr. Rodriguez-Cruz continued to update Dr. Smith thereafter. However, the only treatment notes from Dr. Smith before 2001 relate to the plaintiff's August 2000 hospitalization. (Tr. 559-609.)

antalgic gait toward the right." (Tr. 263-64.) He could do a full squat and stand maneuver and had

a negative straight leg raise with some complaint. *Id.* According to Dr. Surber, the plaintiff's

"[d]eep tendon reflexes were bilaterally equal and diminished to trace out of 2+ with Babinski and

Romberg exams within the normal limits and no lateral drift."[14] (Tr. 264.) Dr. Surber observed that

the plaintiff had "bilaterally equal upper and lower limb strengths and grip strengths at 5/5+, and he

moved easily from the chair to the examination table." *Id.* He also observed that "[e]xamination

of the patient's dorsolumbar spine revealed no gross muscle asymmetry," "no muscle spasm present

with flexion at 90 degrees," and "no areas of decreased sensation to light touch involving his hands

or his feet." (Tr. 263.)

Dr. Surber assessed the plaintiff as moderately obese with gastroesophageal reflux disease

("GERD"), hypertension, history of hepatitis C, history of alcohol use and possible abuse,

depression, anxiety, shortness of breath consistent with chronic obstructive pulmonary disease

("COPD"), and pain. (Tr. 264-65.) He reported that the plaintiff described his pain as

"intermittent . . . in his neck and shoulders but mostly constant pain in his right [lower back] greater

than left lower back and in his feet" and relayed that the pain was "worse in cold or rainy weather

accompanied by stiffness and fatigue." *Id.* Dr. Surber noted that the plaintiff "appeared weaker"

when standing on his right leg and had a "limping, antalgic gait." (Tr. 265.) However, Dr. Surber

also noted that the plaintiff had "no limitations regarding the functional mobility of any of his areas

of complaint or in any of his extremities or joints during today's examination." *Id.* He opined that

---

[14] A Babinski exam is a test to detect Babinski's sign, a "loss or lessening of the Achilles
tendon reflex in sciatica." Dorland's at 1696. A Romberg exam is a test to detect Romberg's sign,
which is "swaying of the body or falling when standing with the feet close together and the eyes
closed" and can be "the result of loss of joint position sense, seen in tabes dorsalis and other diseases
affecting the posterior columns." *Id.* at 1702.

the plaintiff would "be able to occasionally lift or carry at least 10 to 20 pounds during up to 1/3 to 1/2 of an 8-hour workday" and "would be able to stand or walk with normal breaks for up to 2 to 4 hours in an 8-hour workday or sit with normal breaks for up to 6 to 8 hours in an 8-hour workday." *Id.*

On February 18, 2008, Stephen Hardison, M.A., a DDS consultative psychological examiner, conducted a psychological evaluation of the plaintiff. (Tr. 267-71.) Mr. Hardison reported that, while the plaintiff appeared mildly anxious, he did not appear to be in physical distress and his speech was "relevant" and "coherent." (Tr. 267.) The plaintiff reported that his daily activities included helping his wife with chores, watching television, washing dishes, cooking, walking around the yard, driving to the grocery store, attending yard sales occasionally, visiting his mother on weekends, and visiting his children in Georgia about twice a year. (Tr. 268-69.) He reported having no hobbies and no community activities. (Tr. 269.) Mr. Hardison observed that the plaintiff "present[ed] with some mixed anxiety and depressive symptoms which, by his description, [did] not meet the criteria for specific diagnosis." (Tr. 270.) As a result, Mr. Hardison diagnosed the plaintiff with "anxiety disorder, not otherwise specified" ("NOS"). *Id.*

Mr. Hardison opined that the plaintiff could remember and carry out basic one-and two- step instructions as well as "somewhat more detailed instruction[s]" without significant limitations. *Id.* He also opined that the plaintiff's ability to maintain attention and concentration for extended periods and his ability to complete a normal workday "without interruptions from emotional-related symptoms" was no more than mildly limited. *Id.* He rated the plaintiff's ability to interact with the general public as "mildly to possibly moderately limited in certain situations" due to his being "very anxious" in crowds. *Id.* Mr. Hardison also noted that the plaintiff was not significantly limited in

his ability to "get along with" coworkers or supervisors, was able to respond appropriately to changes in routine, and could identify hazards and set goals effectively despite being classified as functioning in the low average to average range intellectually. *Id.*

Dr. Thomas Neilson, Psy.D., a nonexamining DDS consultant, completed a Psychiatric Review Technique ("PRT") on February 28, 2008. (Tr. 272-85.) He determined that the plaintiff had an anxiety disorder, NOS, but that it was not severe. (Tr. 272, 277.) He assessed the plaintiff as having no restrictions on activities of daily living, no episodes of decompensation, and only mild limitations in the areas of social functioning and concentration, persistence, or pace. (Tr. 282.) These findings were "affirmed" on March 26, 2008, by Dr. P. Jeffrey Wright, Ph.D., a nonexamining DDS consultant. (Tr. 294.)

On March 13, 2008, Dr. Reeta Misra, a nonexamining DDS consultative physician, completed a Residual Functional Capacity ("RFC") assessment. (Tr. 286-93.) Dr. Misra found that the plaintiff could occasionally lift and/or carry fifty pounds; frequently lift and/or carry twenty-five pounds; stand and/or walk for six hours out of an eight-hour workday; sit for six hours out of an eight-hour workday; and perform unlimited pushing and/or pulling maneuvers. (Tr. 287.) Dr. Misra also found that the plaintiff had limited far vision acuity and could only occasionally climb, balance, stoop, kneel, crouch, and crawl. (Tr. 288-89.) She noted that the plaintiff had received "very little ongoing [treatment] for anything" and concluded that the limitations identified by Dr. Surber were "[t]oo restrictive in light of exam findings" and that the plaintiff was only partially credible. (Tr. 287-88.)

On April 6, 2008, the plaintiff presented to the Jamestown Regional Medical Center emergency room with complaints of "weakness, nausea, vomiting, diarrhea, and dizziness."

(Tr. 443-44.) He was examined by Dr. Vijaya Patibandla and demonstrated mild to moderate restricted flexion and extension of the lumbosacral spine. (Tr. 443-47.) Dr. Patibandla diagnosed the plaintiff with acute gastroenteritis, chronic low back pain, and nicotine abuse, and he admitted him to the hospital for management of acute gastroenteritis. *Id.* Dr. Patibandla did not treat the plaintiff for his back pain because he "ha[d] not been on any medications" for back pain. (Tr. 447.)

A July 2, 2008 CT scan of the plaintiff's chest revealed "[s]ignificant mediastinal lymphadenopathy"[15] and right hilar[16] as well as possible left hilar lymphadenopathy. (Tr. 381-83.) No pulmonary nodules or masses were noted and no axillary lymphadenopathy could be seen, although there were a "few small lymph nodes noted in the periaortic area." *Id.* On July 31, 2008, the plaintiff saw Dr. Leheb Araim at the Cookeville Regional Medical Center for treatment of right hilar adenopathy.[17] The results of an ECG were normal, the plaintiff was advised to quit smoking, and a mediastinoscopy[18] was scheduled. (Tr. 377-80.)

On August 5, 2008, Dr. Araim conducted a mediastinoscopy with biopsy of R4 nodes and a diagnostic bronchoscopy. (Tr. 384-85.) The procedure revealed "large paratracheal nodes" that,

---

[15] The mediastinum is the "mass of tissues and organs separating the two pleural sacs, between the sternum anteriorly and the vertebral column posteriorly and from the thoracic inlet superiorly to the diaphragm inferiorly. It contains the heart and pericardium, the bases of the great vessels, the trachea and bronchi, esophagus, thymus, lymph nodes, thoracic duct, phrenic and vagus nerves, and other structures and tissues." Dorland's at 1110. Lymphadenopathy is "disease of the lymph nodes." *Id.* at 1074.

[16] Hilar means "pertaining to a hilum." Dorland's at 852. Hilum is "anatomic nomenclature for a depression or pit at the part of the organ where vessels and nerves enter." *Id.*

[17] Adenopathy also means lymphadenopathy. Dorland's at 30.

[18] Mediastinoscopy is an "examination of the mediastinum by means of an endoscope inserted through an anterior incision in the suprasternal notch, permitting direct inspection and biopsy of tissue in the anterior superior mediastinum." Dorland's at 1110.

upon biopsy, revealed "granulomas consistent with sarcoidosis."[19] (Tr. 384.) Dr. Araim commented

that "[a]dditional evaluation to establish a diagnosis of sarcoidosis would be recommended."

(Tr. 386.)  A chest x-ray on August 5, 2008, revealed "[s]light asymmetry along the parenchymal

density," which "could be artifactual or represent some edema in the right lung."  (Tr. 391.)

On September 10, 2008, Dr. Lloyd Walwyn, a nonexamining DDS consultative physician,

completed an RFC assessment.  (Tr. 305-12.)  Dr. Walwyn found the plaintiff to have functional

limitations identical to those identified by Dr. Misra.  *Id.*  Dr. Walwyn also found the plaintiff's

statements to be partially credible and the limitations in Dr. Surber's RFC assessment too restrictive

in light of the plaintiff's "universal [range of motion] and [within normal limits] strength." (Tr. 310-

11.)

From December 2007, to September 2009, nurse practitioner Wendy Reed of the Fentress

County Health Department treated the plaintiff for various ailments.  (Tr. 255-59, 401-33.)  On

December 4, 2007, the plaintiff was treated for bronchitis and prescribed Chantix for smoking

cessation as well as ibuprofen. (Tr. 257.) On January 8, 2008, plaintiff saw Ms. Reed with

complaints of congestion and coughing and reported that he was smoking five to eight cigarettes a

day but had stopped taking Chantix due to nausea.  *Id.*  On January 29, 2008, Ms. Reed counseled

the plaintiff on using Nicorette gum for smoking cessation and refilled his prescription for ibuprofen.

*Id.*  On June 20, 2008, Ms. Reed assessed the plaintiff as having joint pain, paratracheal

lymphadenopathy, cardiomegaly,[20] asthma, reflux, sarcoidosis, tobacco abuse, and hepatitis C.

---

[19] Sarcoidosis is "a chronic, progressive systemic granulomatous reticulosis of unknown etiology, characterized by hard tubercles . . . in almost any organ or tissue, including . . . the lymph nodes."  Dorland's at 1656.

[20] Cardiomegaly is the "abnormal enlargement of the heart from either hypertrophy or dilatation."  Dorland's at 296.

(Tr. 402.) His medications as of that date included ibuprofen, nicotine gum, albuterol, and Flovent.[21] *Id.* On June 27, 2008, the plaintiff returned to receive the results of previous blood work and was treated for heartburn and a rash. (Tr. 405.) He continued to visit Ms. Reed several times a month for asthma, low back pain, and smoking cessation treatment, and she added prescriptions for prednisone, metoclopramide, oxycodone, and alprazolam.[22] (Tr. 401-02, 406-33.)

The record also contains treatment records for Dr. Smith from September 2008, through October 2009. (Tr. 610-23.) On September 19, 2008, the plaintiff was assessed with sarcoidosis, hypercalcemia, splenomegaly, lumbar pain syndrome, and emotional lability.[23] (Tr. 612.) Chest x-rays taken on October 26, 2008, revealed "[n]o evidence of acute cardiopulmonary disease." (Tr. 614.) On February 6, 2009, Dr. Smith diagnosed the plaintiff with anxiety. (Tr. 617.) At his April 3, 2009 appointment, the plaintiff complained of increased shortness of breath, although his chest and lungs appeared clear on exam. (Tr. 618.) On May 29, 2009, Dr. Smith added diagnoses of post laminectomy syndrome and hypertension. (Tr. 619.)

On August 30, 2009, the plaintiff presented to Jamestown Regional Medical Center emergency room with shortness of breath and chest pain. (Tr. 451-54.) He had bronchial spasms and bronchitis and was hypoxemic,[24] and he was admitted to the hospital for testing to rule out

---

[21] Albuterol is a bronchodilator. Saunders at 22. Flovent is a "corticosteroidal anti-inflammatory for chronic asthma; not indicated for acute attacks." *Id.* at 296.

[22] Prednisone is a "corticosteroidal anti-inflammatory; immunosuppressant." Saunders at 575. Metoclopramide is used to treat GERD. *Id.* at 448. Oxycodone is a narcotic analgesic. *Id.* at 524. Alprazolam is a sedative used to treat panic disorders and agoraphobia. *Id.* at 33.

[23] Hypercalcemia is "an excess of calcium in the blood; manifestations include fatigability, muscle weakness, depression, anorexia, nausea, and constipation." Dorland's at 879. Spenomegaly is the enlargement of the spleen. *Id.* at 1741.

[24] Hypoxemic refers to a deficiency of oxygen in the blood. Dorland's at 900.

cardiac issues and to be treated for low oxygen saturation and bronchitis. (Tr. 454.) On exam, the plaintiff had no complaints of weakness, numbness, or tingling and had no history of difficulty sensing touch. (Tr. 455.) He did not appear anxious or depressed but was wheezing and had "questionable pleuritic versus pericardial rub in the left lingula and left mid axilla at the 6th to 7th intercostal area." (Tr. 456.) The attending physician diagnosed the plaintiff with acute exacerbation of COPD, hyperglycemia, and history of sarcoidosis. (Tr. 458-60.) A chest x-ray showed "[n]o evidence of acute cardiopulmonary disease." (Tr. 490.) The plaintiff was discharged from the hospital on September 2, 2009, at which time he was still slightly short of breath and dyspneic but was no longer wheezing. (Tr. 452-53.)

On September 7, 2009, the plaintiff returned to Jamestown Regional Medical Center emergency room with complaints of shortness of breath and chest pain at a ten out of ten. (Tr. 543, 548.) On exam, the plaintiff's respiration was "mildly labored," but a chest x-ray revealed "[n]o evidence of cardiopulmonary disease" and "[n]o significant change" since his chest x-ray in August. (Tr. 548, 620.) He was diagnosed with COPD and sarcoidosis, given Robitussin, fluids and medications intravenously, and discharged in improved condition without being admitted to the hospital. (Tr. 545-46, 549).

On September 22, 2009, Ms. Reed completed a Medical Source Statement regarding the plaintiff's physical ability to do work-related activities. (Tr. 434-37.) She opined that the plaintiff could lift and/or carry less than ten pounds, stand and/or walk less than two hours in an eight-hour workday, sit less than six hours in an eight-hour workday, and was limited in his ability to push and/or pull in both his upper and lower extremities. (Tr. 434-35.) She based these limitations on the plaintiff's "generalized weakness and chronic pain" and noted that he became "very [short of

breath] even when sitting." (Tr. 435.) She also opined that the plaintiff could occasionally balance, kneel, and reach, but could never climb, crouch, crawl, or stoop. (Tr. 435-36.) Ms. Reed explained that these postural and manipulative limitations were due to respiratory problems that could easily be aggravated by these activities and that the plaintiff should also avoid exposure to temperature extremes, noise, dust, humidity, hazards, and fumes for the same reason. *Id.*

On October 6, 2009, the plaintiff presented to Dr. Smith with depression, hypertension, and low back pain. (Tr. 621.) On exam, the plaintiff had normal breathing without rales, rhonchi, wheezes, or rubs, but exhibited decreased range of motion in back flexion. (Tr. 622.) Dr. Smith determined that the plaintiff was suffering from sarcoidosis, degeneration of lumbar disc, essential hypertension, unspecified, and depression. *Id.* He ordered a chest x-ray, spirometry testing, and pulse oximetry.[25] (Tr. 622-23.)

### B. Hearing Testimony

A hearing was conducted on November 4, 2009, at which the plaintiff was represented by counsel, and the plaintiff and Katharine Bradford, a vocational expert ("VE"), testified. (Tr. 28-50.) The plaintiff testified that he completed the tenth grade, has a driver's license, and previously worked as a cabinet maker. (Tr. 32-33.) He indicated that he is married and lives with his wife in a house provided by his in-laws. (Tr. 32, 36.) He testified that he was incarcerated for evading arrest and

---

[25] Spirometry is the "measurement of the breathing capacity of the lungs." Dorland's at 1739. Oximetry is the "determination of the oxygen saturation of arterial blood using an oximeter." *Id.* at 1344.

criminal simulation[26] from November 2002 until November 2006, and that he did not receive medical treatment during that time.[27] (Tr. 34-35.)

The plaintiff testified that he underwent back surgery in September 2000 to address an injury that had resulted in a pinched nerve in his spine. (Tr. 34, 38.) He related that his back pain and right leg numbness did not improve after surgery and that he has had muscle spasms in his back and right leg around eight times a day since the surgery. (Tr. 39.) He described his right foot as "totally numb" and his back and leg pain as "burning" with "stabbing" sensations. *Id.* He explained that he received epidural injections following his surgery and that the injections were helpful for some time but became less effective over time. (Tr. 40-41.) The plaintiff relayed that his doctors suggested spinal cord stimulation as a course of treatment but that he was unable to afford it due to his lack of health insurance. *Id.*

The plaintiff testified that he has pain "[d]aily" and "[c]onstantly." (Tr. 35.) He rated his pain after taking medication as a seven out of ten and stated that he could sit approximately five minutes before needing to "switch positions." (Tr. 42.) He testified that he does not have any side effects from his medication and estimated that he needs to lie down 4-5 times a day. (Tr. 35-36, 42.) He testified that, during a typical day, he eats breakfast, watches television, reads, and otherwise stays at his house unless he needs to go to the store. (Tr. 37.) He added that he helps with chores around the house but has difficulty doing so. *Id.* He said that he enjoys woodworking but that it had become too difficult for him to do. *Id.*

---

[26] The plaintiff explained that he "was caught with some counterfeit money in [his] possession." (Tr. 34.)

[27] However, it appears that the plaintiff was treated by Dr. Smith on January 23, 2003. (Tr. 237.)

The plaintiff also recounted that he has breathing problems and has been diagnosed with mediastinal lymphadenopathy and sarcoidosis lymphoma. (Tr. 43-44.) He testified that he uses a nebulizer "breathing machine" every four hours but that the treatments have done nothing to improve his condition. *Id.* He explained that he can walk only about thirty feet before becoming short of breath and that he cannot tolerate exposure to chemical fumes. (Tr. 43.)

The VE classified the plaintiff's past job of cabinet maker as medium exertion work, but she noted that the plaintiff "indicated lifting at a very heavy exertional level in his performance of that occupation." (Tr. 45.) The ALJ asked the VE to consider a hypothetical person with the plaintiff's work history and educational background who was "restricted to a medium exertional level and [could] do no more than occasional climbing, balancing, stooping, bending, bouncing, crawling or kneeling." *Id.* The ALJ asked whether such a person could return to the job of cabinet maker, and the VE responded that "such a person could perform the occupation of cabinet maker as it's described in the *Dictionary of Occupational Titles*." (Tr. 45-46.)

The ALJ then asked whether there would be other work at the medium level that such a person could perform, and the VE indicated that the occupations of "cleaner general," production laborer, and machine tender could all be performed by someone at the medium, unskilled level. (Tr. 46.) The ALJ also asked whether there were available jobs "if the individual has the same postural restrictions, but is restricted to light exertional level" and the VE responded that such a person could work in light, unskilled jobs such as assembler, grader/sorter, and inspector. (Tr. 46-47.) Finally, the ALJ asked, "if the individual, because of breathing difficulty, is precluded from work that exposes him to dust, fumes, smoke, chemicals and noxious gases, would that have any effect on his ability to do the work that you've listed?" (Tr. 47.) The VE testified that this additional

19

restriction would reduce the number of positions available by about 20% percent. *Id*. The VE also testified that a requirement of a "sit/stand option every 30 minutes" "would eliminate all of the medium" level occupations and would reduce the available light level occupations by 60-70%. *Id.* The VE also indicated that all work would be precluded if the individual were unable to complete an eight-hour workday on a regular basis because of severe pain. *Id.*

### III. THE ALJ'S FINDINGS

The ALJ issued an unfavorable ruling on January 25, 2010. (Tr. 10-22.) Based upon the record, the ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2005.

2. The claimant has not engaged in substantial gainful activity since December 30, 2005, the amended alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

3. The claimant has the following impairments, the _combination_ of which is severe: *obesity, degenerative disc disease of the lumbar spine with post-laminectomy syndrome and lumbar radiculopathy*. (20 CFR 404.1520(c) and 416.920(c)).

   ***

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

   ***

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform *light* work as defined in 20 CFR 404.1567(b) and 416.967(b) except that he is precluded from more than occasional climbing, balancing, stooping, bending, crouching, crawling, or kneeling.

***

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

***

7.    The claimant was born on February 22, 1974 and was 26 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. (20 CFR 404.1563 and 416.963).

8.    The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

***

11.    The claimant has not been under a disability, as defined in the Social Security Act, from December 30, 2005, the amended alleged onset date, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 12-22. Emphasis in original.)

## IV. DISCUSSION

**A. Standard of Review**

The determination of disability under the Act is an administrative decision, and the only

questions before this Court are whether the decision of the Commissioner is supported by substantial

evidence and whether the Commissioner employed the proper legal standards in reaching her

conclusion.  42 U.S.C. § 405(g).  *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420,

28 L. Ed. 2d 842 (1971) (adopting and defining substantial evidence standard in context of Social

Security cases); *Kyle v. Comm'r Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010).  The Commissioner's

decision must be affirmed if it is supported by substantial evidence, "even if there is substantial

evidence in the record that would have supported an opposite conclusion."  *Blakely v. Comm'r of

Soc. Sec.,* 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir.

1997)); *Jones v. Comm'r of Soc. Sec.,* 336 F.3d 469, 477 (6th Cir. 2003); *Her v. Comm'r of Soc.

Sec.,* 203 F.3d 388, 389-90 (6th Cir. 1999).  Substantial evidence is defined as "more than a mere

scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229,

59 S. Ct. 206, 83 L. Ed. 126 (1938)); *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir.

2007); *Le Master v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976) (quoting Sixth Circuit opinions

adopting language substantially similar to that in *Richardson*).

A reviewing court may not try the case *de novo*, resolve conflicts in evidence, or decide

questions of credibility.  *See, e.g., Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing

*Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)).  The Court must accept the ALJ's

explicit findings and determination unless the record as a whole is without substantial evidence to

support the ALJ's determination.  42 U.S.C. § 405(g). *See, e.g., Houston v. Sec'y of Health &

Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).

The Commissioner must employ a five-step evaluation process in determining the issue of

disability.  *See, e.g., Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (citing *Abbot

*v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)).  The original burden of establishing disability is on the plaintiff, and impairments must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques.  *See* 42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a), (c), 404.1513(d).  First, the plaintiff must show that he is not engaged in "substantial gainful activity" at the time he seeks disability benefits.  *Id.*  (citing 20 C.F.R. §§ 404.1520(b), 416.920(b)); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007).  A plaintiff who is performing substantial gainful activity is not disabled no matter how severe the plaintiff's medical condition may be.  *See, e.g., Dinkel v. Sec'y of Health & Human Servs.*, 910 F.2d 315, 318 (6th Cir. 1990).

Second, the plaintiff must show that he suffers from a severe impairment that meets the twelve month durational requirement.  20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  *See also Edwards v. Comm'r of Soc. Sec.*, 113 Fed. Appx. 83, 85 (6th Cir. 2004).  A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Barnhart v. Thomas*, 540 U.S. 20, 24, 124 S. Ct. 376, 157 L. Ed.2d 333 (2003) (citing 20 C.F.R. §§ 404.1520(c), 416.920(c)).  Basic work activities are "the abilities and aptitudes necessary to do most jobs," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; [c]apacities for seeing, hearing, and speaking; [u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b).  The Commissioner is required to consider the combined effects of impairments that individually are not severe but cumulatively may constitute a severe impairment.  42 U.S.C. § 423(d)(2)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

Third, if the plaintiff is not engaging in substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the plaintiff is presumed disabled without further inquiry, regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d), 416.920(d)). The plaintiff may establish that he meets or equals a listed impairment, and that the impairment has lasted or is expected to last for at least twelve months or result in death. *See Listenbee v. Sec'y of Health & Human Servs.*, 846 F.2d 345, 350 (6th Cir. 1988). The plaintiff is not required to show the existence of a listed impairment in order to be found disabled, but such a showing results in an automatic finding of disability. *See Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989).

Fourth, if the plaintiff's impairment does not prevent him from doing his past relevant work, he is not disabled. *Id.* The plaintiff has the burden of proving inability to perform past relevant work or proving that a particular past job should not be considered relevant. *Cruse*, 502 F.3d at 539; *Jones*, 336 F.3d at 474 ("Through step four, the [plaintiff] bears the burden of proving the existence and severity of limitations caused by his impairments and the fact that he is precluded from performing his past relevant work"); *Smith v. Sec'y of Health & Human Servs.*, 893 F.2d 106, 109 (6th Cir. 1989). If the plaintiff fails to carry this burden, he must be denied disability benefits.

Once the plaintiff establishes a *prima facie* case that he is unable to perform his prior relevant employment, the burden shifts in step five to the Commissioner to show that the plaintiff can perform other substantial gainful employment and that such employment exists in significant numbers in the national economy. *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (quoting *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997)). *See also Felisky*

*v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). To rebut a *prima facie* case, the Commissioner must come forward with proof of the existence of other jobs a plaintiff can perform. *Longworth*, 402 F.3d at 595. *See also Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957, 103 S. Ct. 2428, 77 L. Ed. 2d 1315 (1983) (upholding the validity of the medical-vocational guidelines grid as a means for the Commissioner of carrying her burden under appropriate circumstances). It remains the plaintiff's burden to prove the extent of his functional limitations. *Her*, 203 F.3d at 391. Even if the plaintiff's impairment does prevent him from doing his past relevant work, if other work exists in significant numbers in the national economy that the plaintiff can perform, he is not disabled. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009). *See also Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028-29 (6th Cir. 1990); *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 88-89 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966, 969-70 (6th Cir. 1985).

If the question of disability can be resolved at any point in the sequential evaluation process, the claim is not reviewed further. 20 C.F.R. § 404.1520(a)(4). *See also Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (holding that resolution of a plaintiff's claim at step two of the evaluative process is appropriate in some circumstances).

### B. The Five-Step Inquiry

In this case, the ALJ resolved the plaintiff's claim at step five of the five-step process. At step one, the ALJ found that the plaintiff had not engaged in substantial gainful activity since his alleged disability onset date. (Tr. 12.) At step two, the ALJ determined that the plaintiff had the following impairments, the combination of which is severe: "obesity, degenerative disc disease of

the lumbar spine with post-laminectomy syndrome and lumbar radiculopathy." *Id.* At step three, the ALJ found that the plaintiff's impairments, either singly or in combination, did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 17.) At step four, the ALJ determined that the plaintiff was not able to perform his past relevant work as a cabinet maker. (Tr. 20-21.) At step five, the ALJ determined that the plaintiff was able to work as an assembler, grader-sorter, and inspector. (Tr. 21.)

### C. The Plaintiff's Assertions of Error

The plaintiff argues that the ALJ erred in finding that the plaintiff did not meet the requirements of Listing 1.04A. Docket Entry No. 14, at 8-9. The plaintiff also contends that the ALJ "improperly dismissed" nurse practitioner Reed's opinion after finding that she was not an "acceptable medical source." *Id.* at 9. Finally the plaintiff argues that the ALJ did not properly evaluate his subjective complaints of pain. *Id.* at 10-11.

### 1. The ALJ Properly Found that the Plaintiff Neither Meets Nor Equals Listing 1.04A.

First, the plaintiff argues that the ALJ erred in finding that he did not meet Listing 1.04A. Docket Entry No. 14, at 8-9.

At step three, the burden of proof lies with the plaintiff to prove that his impairment meets or equals an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. *Her v. Comm'r of Soc. Sec*, 203 F.3d 388, 391 (6th Cir. 1999); *Little v. Astrue*, 2008 WL 3849937, at *4 (E.D. Ky. Aug. 15, 2008). The plaintiff's impairment must meet all of the listing's specified medical criteria; "[a]n impairment that manifests only some of those criteria, no matter how severely, does not qualify."

*Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S. Ct. 885, 107 L. Ed.2d 967 (1990). *See also Elam ex rel. Golay v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003). If the plaintiff's impairment does not meet the criteria of a listing, he can present evidence that his impairment is medically equivalent to a listing. *Bailey v. Comm'r of Soc. Sec.*, 413 Fed. Appx. 853, 854 (6th Cir. 2011); 20 C.F.R. §§ 404.1525(c)(5); 404.1526. For the plaintiff to establish medical equivalence, he "must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment." *Zebley*, 493 U.S. at 531 (emphasis in original). If the plaintiff demonstrates that his impairment meets or equals a listed impairment, then the ALJ "'must find the [plaintiff] disabled.'" *Little*, 2008 WL 3849937, at *4 (quoting *Buress v. Sec'y of Health and Human Servs.*, 835 F.2d 139, 140 (6th Cir. 1987)).

In this case, the plaintiff asserts that he meets Listing 1.04A,[28] which has the following criteria:

> 1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04A. Thus, in order for the plaintiff to be found disabled under Listing 1.04A, he must demonstrate that he has: "(1) a spinal disorder that (2) result[ed] in 'compromise of a nerve root' with (3) 'neuro-anatomic distribution of pain,' (4) 'limitation of

---

[28] The plaintiff does not argue that he medically equals Listing 1.04A.

motion of the spine,' and (5) motor loss (muscle weakness) accompanied by (6) sensory or reflex loss." Report and Recommendation entered in *Smith v. Astrue*, 2013 WL 80185, at *3 (S.D. Ohio Jan. 7, 2013) and adopted by the Court (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04A). Because the plaintiff alleges involvement of the lower back, he must also demonstrate a positive straight-leg raising test in the sitting and supine positions. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04A.

The plaintiff argues that objective evidence from 2000 and 2001 demonstrates that he meets Listing 1.04A. Docket Entry No. 14, at 8-9. In March 2000, an MRI of the plaintiff's lumbar spine showed "[m]ild disc bulge at L4-5" and a disc bulge at L5-6 with possible "disc extrusion toward the right side of the canal which may be contacting the right nerve rootlet behind the S1 vertebral body." (Tr. 206.) Throughout May and June of 2000, the plaintiff received epidural steroid injections, reporting "near complete resolution of his low back pain" following the third injection. (Tr. 198, 215-21.) In September 2000, the plaintiff underwent a right L5-S1 microdiskectomy (tr. 209-11) and, during a follow-up examination, demonstrated normal strength, sensation, and reflexes, although he continued to complain of leg pain and Dr. Rodriguez-Cruz speculated that he may "have permanent nerve damage." (Tr. 195.) The plaintiff attended physical therapy in October and November 2000, where he demonstrated five out of five strength on the left side, greater than three out of five strength on the right side, reported less stiffness, little, if any, low back pain, and increased mobility. (Tr. 320-22.)

By December 2000, the plaintiff was again experiencing low back pain radiating into his right leg and began treatment at a pain clinic. (Tr. 324-26.) During physical examination, he exhibited decreased range of motion of his lumbar spine, tenderness in his low back, and pain on flexion, but

he also demonstrated five out of five muscle strength bilaterally in both upper and lower extremities. (Tr. 326.) An MRI in March 2001, revealed "disc bulges at L3-4 and L4-5 producing effacement of the thecal sac, but no nerve root involvement;" "a laminectomy defect at L5 on the right," and "an area of decreased signal . . . at the L5-S1 level obliterating the S1 nerve root on the right pre-contrast" and "completely encas[ing] the S1 nerve root on the right" post contrast. (Tr. 232-33.) In June 2001, however, the plaintiff indicated that he had improved by at least 60% overall, was "doing well on his current medications," and did not wish to receive a spinal cord stimulator or undergo surgery. (Tr. 346-47.) The plaintiff continued to visit Dr. Leone at the pain clinic through 2001 and 2002. (Tr. 349-71.) During that time, the plaintiff demonstrated limited range of motion and muscle spasms, but also demonstrated "[g]ood flexion and extension of the lumbar spine," and "[g]ood lateral rotation." (Tr. 352, 355.) The plaintiff received additional lumbar transforaminal epidural steroid injections in December 2001 and February 2002 to address his right leg radiculopathy. (Tr. 359-61, 366-69.)

As the ALJ noted, however, the plaintiff received very little treatment regarding his lumbar pain following this period of treatment in 2000-2002. (Tr. 13.) The ALJ found that "*current medical evidence of record since the alleged onset date supporting the degree of limitations alleged by the claimant is notably missing. In fact, the majority of the claimant's purported treatment for the alleged impairments is remote, relative to the amended alleged onset date.*" *Id.* (Emphasis in original.)

While being treated by Dr. Smith in 2008 and 2009, the plaintiff was diagnosed as having lumbar pain syndrome (tr. 612-13, 615-18), and in May 2009, he was further assessed as having post laminectomy syndrome. (Tr. 619.) However, treatment notes from this period of time do not

29

suggest that the plaintiff had decreased range of motion of the spine,[29] motor loss, sensory or reflex loss, or positive straight-leg raise tests. (Tr. 405-33, 610-23.)

Dr. Surber completed a consultative physical examination in February 2008. (Tr. 261-65.) During that examination, the plaintiff did not exhibit sensory or reflex loss and had "full and unlimited range of motion of his right and left elbows, hips, knees, ankles, wrists, hands and fingers including both thumbs." (Tr. 263.) While he had some palpable tenderness of the lumbar spine, he demonstrated "no gross muscle asymmetry." *Id.* Dr. Surber noted that the plaintiff had "no areas of decreased sensation to light touch involving his hands or feet," Babinski's and Romberg's signs were within normal limits, and the plaintiff "had bilaterally equal upper and lower limb strengths and grip strengths at 5/5+." *Id.* Dr. Surber also noted that the plaintiff walked with a "limping, antalgic gait toward the right," but "was able to perform the straightaway, tandem and heel-toe walks" and "moved easily from the chair to the examination table." *Id.* He was also able to perform straight leg raises in the sitting and supine positions albeit with some complaints. *Id.* Dr. Surber concluded that the plaintiff had "no limitations regarding the functional mobility of any of his areas of complaint or in any of his extremities or joints."

The ALJ relied heavily on Dr. Surber's findings when she concluded that the plaintiff did not meet or equal Listing 1.04A. (Tr. 17, 261-65.) After reviewing the record, the Court concludes that substantial evidence supports the ALJ's decision. While the plaintiff has, at times, met some of the criteria of the listing, the record does not indicate that he ever satisfied all of its criteria. The medical evidence shows that, although the plaintiff previously had disc bulges at L3-4 and L4-5 with no

---

[29] The lone exception occurred on October 10, 2009, when the plaintiff complained to Dr. Smith of low back pain radiating down his right leg, and Dr. Smith noted that the plaintiff had decreased range of motion during back flexion. (Tr. 621-22.)

nerve root involvement, and an area of decreased signal at L5-S1 "obliterating" the S1 nerve root, those conditions did not manifest themselves as required by Listing 1.04A during the relevant period of disability. The plaintiff has failed to show neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss accompanied by sensory or reflex loss, or positive straight leg raising tests during the period of disability. Thus, the plaintiff has failed to satisfy the necessary criteria to be considered disabled under Listing 1.04A.

### 2. The ALJ Properly Considered the Opinion of Nurse Practitioner Reed.

The plaintiff contends that the ALJ "improperly dismissed" Ms. Reed's opinion. Docket Entry No. 14, at 9. According to the Regulations, the SSA "will evaluate every medical opinion" that it receives. 20 C.F.R. § 404.1527(c). However, every medical opinion is not treated equally, and the Regulations describe three classifications for acceptable medical opinions: (1) nonexamining sources; (2) nontreating sources; and (3) treating sources. A nonexamining source is "a physician, psychologist, or other acceptable medical source[30] who has not examined [the claimant] but provides a medical or other opinion in [the claimant's] case." 20 C.F.R. § 416.902. A nontreating source is described as "a physician, psychologist, or other acceptable medical source who has examined [the claimant] but does not have, or did not have, an ongoing treatment relationship with [the claimant]." *Id.* Finally, the Regulations define a treating source as "[the claimant's] own physician, psychologist, or other acceptable medical source who provides [the claimant], or has provided [the

---

[30] The Regulations define acceptable medical sources as licensed physicians, both medical and osteopathic doctors, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. 20 C.F.R. § 404.1513(a).

claimant], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." *Id.* An "ongoing treatment relationship" is a relationship with an "acceptable medical source when the medical evidence establishes that [the claimant] see[s], or [has] seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the claimant's] medical condition(s)." *Id.*

Generally, an ALJ is required to give "controlling weight" to the medical opinion of a treating source, as compared to the medical opinion of a non-treating source, if the opinion of the treating source is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 416.927(c)(2).[31] *See also Tilley v. Comm'r of Soc. Sec.*, 394 Fed. Appx. 216, 222 (6th Cir. Aug. 31, 2010); *Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir. 2009). This is commonly known as the treating physician rule. *See* Soc. Sec. Rul. 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

Even if a treating source's medical opinion is not given controlling weight, it is "'still entitled to deference and *must be weighed using all of the factors provided in [20 C.F.R. 416.927] . . . .*'" *Fisk v. Astrue*, 253 Fed. Appx. 580, 585 (6th Cir. 2007) (quoting Soc. Sec Rul. 96-2p, 1996 WL 374188, at *4) (emphasis in original). The ALJ must consider:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the supportability of the opinion with respect to relevant evidence such as medical signs and laboratory findings; (4)

---

[31] Effective March 26, 2012, the numbering for the treating physician rules changed. Section 416.927(d)(2) became section 416.927(c)(2), and the identically worded and interpreted section 404.1527(d)(2) became section 404.1527(c)(2). *See Johnson-Hunt v. Comm'r of Soc. Sec.*, 2012 WL 4039752, at *6 n.6 (6th Cir. Sept. 14, 2012).

the consistency of the opinion with the record as a whole; (5) the specialization of the physician rendering the opinion; and (6) any other factor raised by the applicant.

*Meece v. Barnhart*, 192 Fed. Appx. 456, 461 (6th Cir. 2006) (quoting current 20 C.F.R. § 404.1527(c)(2)-(6)). The ALJ must also provide "good reasons" for the resulting weight given to the treating source. Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *5 (citing current 20 C.F.R. §§ 404.1527(c)(2); 416.927(c)(2)). The "good reasons" must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* If an ALJ fails to adhere to this procedural requirement, the case should be remanded for further clarification.[32] *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544-45 (6th Cir. 2004).

---

[32] The rationale for the "good reasons" requirement is to provide the claimant with a better understanding of the reasoning behind the decision in his case and to ensure that the ALJ properly applied the treating physician rule. *Wilson*, 378 F.3d at 544 (quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)).

However, under the Regulations, nurse practitioners are not classified as acceptable medical sources but as "other sources."[33] 20 C.F.R. § 404.1513(d). Social Security Ruling ("SSR") 06-03p has noted that:

> [w]ith the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not "acceptable medical sources," such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of treatment and evaluation functions previously handled primarily by physicians and psychologists. Opinions from these medical sources, who are not technically deemed "acceptable medical sources" under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with other relevant evidence in the file.

Soc. Sec. Rul. 06-03p, 2006 WL 2329939, at *3 (quoted in *Heaberlin v. Astrue*, 2010 WL 1485540, at *4 (E.D. Ky. Apr. 12, 2010)). SSR 06-03p clarified the treatment of "other sources" by explaining that:

> [a]lthough the factors in 20 CFR 404.1527(d) and 416.927(d) explicitly apply only to the evaluation of medical opinions from "acceptable medical sources," these same factors can be applied to opinion evidence from "other sources." These factors represent basic principles that apply to the consideration of all opinions from medical sources who are not "acceptable medical sources" as well as from "other sources," such as teachers and school counselors, who have seen the individual in their professional capacity. These factors include:

---

[33] The Regulations define other sources as:
(1) Medical sources not listed in paragraph (a) of this section (for example, nurse-practitioners, physicians' assistants, naturopaths, chiropractors, audiologists, and therapists);
(2) Educational personnel (for example, school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers);
(3) Public and private social welfare agency personnel; and
(4) Other non-medical sources (for example, spouses, parents and other caregivers, siblings, other relatives, friends, neighbors, and clergy).

20 C.F.R. § 404.1513(d).

• How long the source has known and how frequently the source has seen the individual;

• How consistent the opinion is with other evidence;

• The degree to which the source presents relevant evidence to support an opinion;

• How well the source explains the opinion;

• Whether the source has a specialty or area of expertise related to the individual's impairment(s); and

• Any other factors that tend to support or refute the opinion.

2006 WL 2329939, at *4-5. *See also Roberts v. Astrue*, 2009 WL 1651523, at *7-8 (M.D. Tenn. June 11, 2009) (Wiseman, J.). Finally, SSR 06–03p provides that:

> [s]ince there is a requirement to consider all relevant evidence in an individual's case record, the case record should reflect the consideration of opinions from medical sources who are not "acceptable medical sources" and from "non-medical sources" who have seen the claimant in their professional capacity. Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.

2006 WL 2329939, at *6 (quoted in *Boran ex rel. S.B. v. Astrue,* 2011 WL 6122953, at *13 (N.D. Ohio Nov. 22, 2011). *See also Cruse*, 502 F.3d at 541; *Hatfield v. Astrue*, 2008 WL 2437673, at *3 (E.D. Tenn. June 13, 2008) ("The Sixth Circuit, however, appears to interpret the phrase 'should explain' as indicative of strongly suggesting that the ALJ explain the weight, as opposed to leaving the decision whether to explain to the ALJ's discretion.") (quoted in *Boran*, 2011 WL 6122953, at *13; and *Brandon v. Astrue*, 2010 WL 1444639, at *9 (N.D. Ohio Jan. 27, 2010)).

In her Medical Source Statement, Ms. Reed estimated that, in a typical eight-hour workday, the plaintiff would be able to sit for less than six hours and stand and/or walk for less than two hours.

(Tr. 434-35.) Ms. Reed also opined that the plaintiff could never lift more than ten pounds, that his ability to push and pull was limited in both his upper and lower extremities, and that he could only occasionally balance, kneel, and reach but could never climb, crouch, crawl, or stoop. (Tr. 434-36.) Finally, Ms. Reed opined that the plaintiff should avoid exposure to hazards, humidity, fumes, noise, dust, and temperature extremes. (Tr. 324.)

As a basis for her decision to give Ms. Reed's opinion little weight, the ALJ first noted that, as a nurse practitioner, Ms. Reed was not an "acceptable medical source" as defined in the Regulations and that only "acceptable medical sources" can give medical opinions. (Tr. 19.) The ALJ also noted that Ms. Reed's assessment was "overly-restrictive and inconsistent with the preponderance of the other substantial evidence of record. It is also quite conclusory, as she provided no indication of any objective evidence she relied upon in forming her opinions." *Id.*

After reviewing the record, the Court concludes that the ALJ properly assessed Ms. Reed's opinion. The ALJ was correct that Ms. Reed is not an acceptable medical source and that only acceptable medical sources can give medical opinions. *See* 20 C.F.R. §§ 404.1513(a),(d); 404.1527(a)(2). Consequently, the ALJ was not required to give Ms. Reed's opinion controlling weight as if she were a treating source and only needed to consider her opinion in light of the factors outlined in SSR 06-03p. *See* 2006 WL 2329939, at *4-5. *See also Roberts*, 2009 WL 1651523, at *7-8. Here, the ALJ decided to give little weight to Ms. Reed's assessment based on the factors of supportability and inconsistency with other evidence in the record. (Tr. 19-20.)

As the ALJ noted, while Ms. Reed's opinion contains some cursory explanations regarding the plaintiff's limitations, these explanations are conclusory and do not appear to be based on objective evidence. For example, Ms. Reed based the plaintiff's exertional limitations on

"generalized weakness," "chronic pain," and shortness of breath while sitting. (Tr. 434-35.) She opined that the plaintiff should avoid a host of environmental irritants because "exposure . . . would greatly increase breathing problems." (Tr. 437.) The ALJ found these explanations lacking, and the Court agrees that Ms. Reed's opinion is not particularly informative and contains very little elaboration or analysis apart from reciting the plaintiff's symptoms. While she offers explanations of "generalized weakness," "chronic pain," and shortness of breath, she gives no clinical information as a basis for these conditions. *Id.*

Moreover, Ms. Reed did not provide objective support for her opinions. For example, she did not cite any of her own treatment notes or the results of testing in formulating her Medical Source Statement. (Tr. 434-37.) Likewise, Ms. Reed's treatment notes do not support the severe limitations that she placed on the plaintiff. Ms. Reed's records do not indicate that she ever performed a physical examination on the plaintiff to determine muscle strength, muscle weakness, or range of motion. *Id.* Nor do Ms. Reed's records contain observations regarding the plaintiff's ability to ambulate, whether he uses a protective posture, or his overall demeanor. *Id.* During her treatment of the plaintiff, Ms. Reed seemed to do little more than refill his prescriptions. (Tr. 401-33.) Ms. Reed's treatment notes do not support the significant limitations that she placed on the plaintiff in her Medical Source Statement.

Ms. Reed's opinion was also inconsistent with the opinions of consultative physicians, Drs. Misra and Walwyn, to whose opinions the ALJ gave some weight. (Tr. 20, 286-93, 305-312.) Drs. Misra and Walwyn both opined that the plaintiff could lift and/or carry fifty pounds occasionally and twenty-five pounds frequently; stand and/or walk about six hours and sit about six hours in an eight-hour workday; and push and/or pull without limitations. (Tr. 287, 305.) While they agreed

with Ms. Reed that the plaintiff had occasional postural limitations, they found no manipulative, communicative, or environmental limitations.[34] (Tr. 288-90, 307-09.) Dr. Misra opined that the plaintiff was only partially credible, noting that, during the examination by Dr. Surber, the plaintiff's lungs were clear and he had no shortness of breath on exam maneuvers, had no difficulty moving to and from the exam table, had five out of five strength, and was able to perform a full squat as well as tandem and heel-toe walks. (Tr. 288.) Similarly, Dr. Walwyn opined that the plaintiff's "universal [range of motion] and [within normal limits] strength" belied more restrictive limitations. (Tr. 311.)

The ALJ concluded that the opinions of Drs. Misra and Walwyn were a better reflection of the medical record as a whole than the opinion of Ms. Reed. The ALJ appropriately considered Ms. Reed's opinion and adequately explained her reasons for giving Ms. Reed's opinion little weight.

### 3. The ALJ Properly Assessed the Plaintiff's Credibility.

The plaintiff contends that the ALJ erred in evaluating the credibility of his subjective complaints of pain. Docket Entry No. 14, at 10-11. The Commissioner counters that the ALJ properly assessed the plaintiff's credibility. Docket Entry No. 19, at 23-29.

The ALJ is charged with evaluating the credibility of the plaintiff at the hearing, and the ultimate decision of credibility rests with the ALJ. *See, e.g., Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The ALJ's

---

[34] Drs. Misra and Walwyn did find that the plaintiff had a visual limitation with regard to far acuity. (Tr. 289, 308.)

credibility finding is entitled to deference "because of the ALJ's unique opportunity to observe the claimant and judge [his] subjective complaints." *See Buxton v. Halter*, 346 F.3d 762, 773 (6th Cir. 2001) (internal citations omitted). If the ALJ rejects the plaintiff's complaints, however, she must clearly articulate her reasons for this finding. *Wines v. Comm'r of Soc. Sec.*, 268 F. Supp.2d 954, 958 (N.D. Ohio 2003) (citing *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir.1994)). Moreover, Social Security Ruling 96-7p emphasizes that credibility determinations must find support in the record, and not be based upon the "intangible or intuitive notion[s]" of the ALJ. 1996 WL 374186, at *4. In assessing the plaintiff's credibility, the ALJ must consider the record as a whole, including the plaintiff's complaints, lab findings, information provided by treating physicians, and other relevant evidence. *Id*. at *5. An "ALJ may distrust a claimant's allegations of disabling symptomatology if the subjective allegations, the ALJ's personal observations, and the objective medical evidence contradict each other." *Moon v. Sullivan*, 923 F.2d 1175, 1183 (6th Cir. 1990). The ALJ must explain her credibility determination such that both the plaintiff and subsequent reviewers will know the weight given to the plaintiff's statements and the reason for that weight. Soc. Sec. Rul. 96-7p, 1996 WL 374186, at *4.

Both the SSA and the Sixth Circuit have provided guidelines for use in analyzing a plaintiff's subjective complaints of pain. *See* 20 C.F.R. § 404.1529; *Felisky*, 35 F.3d at 1037. While the inquiry into subjective complaints of pain must begin with the objective medical record, it does not end there. The Sixth Circuit in *Duncan v. Secretary of Health and Human Services*, 801 F.2d 847 (6th Cir. 1986), set forth the basic standard for evaluating such claims.[35] The *Duncan* test has two

---

[35] Although *Duncan* only applied to determinations made prior to 1987, the Sixth Circuit has since held that *Duncan* continues to apply to determinations made after 1987. *See Felisky*, 35 F.3d at 1039 n.2.

prongs. The first prong is whether there is objective medical evidence of an underlying medical condition. *Felisky*, 35 F.3d at 1039 (quoting *Duncan*, 801 F.2d at 853). The second prong has two parts: "(1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain." *Id.* This test does not require objective evidence of the pain itself. *Duncan*, 801 F.2d at 853 (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3rd Cir. 1984)).

The SSA provides a checklist of factors to assess symptoms, including pain, in 20 C.F.R. § 404.1529(c). The ALJ cannot ignore a plaintiff's statements detailing the symptoms, persistence, or intensity of his pain simply because current objective medical evidence does not fully corroborate the plaintiff's statements. 20 C.F.R. § 404.1529(c)(2). Besides reviewing medical records to address the credibility of a plaintiff's symptoms of pain, an ALJ must review the entire case record in light of the seven factors set forth in 20 C.F.R. § 404.1529(c)(3).[36]

The ALJ satisfied the first prong of the *Duncan* test when she found that the plaintiff had a medically determinable impairment that could reasonably be expected to produce some of the alleged symptoms. (Tr. 18.) However, the ALJ found that the plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms were not credible to the extent that they

---

[36] The seven factors under 20 C.F.R. § 404.1529(c)(3) include: (i) the plaintiff's daily activities; (ii) the location, duration, frequency, and intensity of the plaintiff's pain or other symptoms; (iii) precipitating and aggravating factors; (iv) the type, dosage, effectiveness and side effects of any medication the plaintiff takes or has taken to alleviate pain or other symptoms; (v) treatment, other than medication, plaintiff received or has received for relief of pain or other symptoms; (vi) any measures plaintiff uses or has used to relieve pain or other symptoms (e.g. lying flat on his back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and (vii) other factors concerning the plaintiff's functional limitations and restrictions due to pain or other symptoms.

were inconsistent with the ALJ's RFC finding.  *Id*.  Contrary to the plaintiff's assertion that the ALJ did not properly address his credibility, the ALJ in fact discussed the plaintiff's credibility in significant detail.  (Tr. 18-20.)

The ALJ relied upon the plaintiff's medical records and testimony in making her credibility assessment and articulated several reasons supporting her decision.  *Id.*  The ALJ addressed, *inter alia*, the plaintiff's surgical and non-surgical treatment history, success controlling his symptoms through treatment, failure to attend various treatment sessions, daily activities, work history, and modest physical examination findings.  *Id.*  While emphasizing that her observation was only one factor among many, the ALJ noted the claimant's "unpersuasive appearance and demeanor" at the hearing, pointing out that the claimant did not appear to be in pain or discomfort at all.  (Tr. 19.)  The ALJ also considered the plaintiff's past conviction for a crime of moral turpitude,[37] explaining that "[p]ast conduct that is considered contrary to community standards of justice, honesty, and/or good morals is material in analyzing whether the claimant has a demonstrated propensity toward misrepresentation of facts."  *Id.*

The ALJ explained her reasoning for finding the plaintiff's subjective complaints not credible in great detail and addressed many of the factors outlined in 20 C.F.R. § 404.1529(c)(3).  The Court

---

[37] The Court notes that, "[w]hile [the] plaintiff's criminal history is not directly relevant to the issue of disability, it is relevant for other reasons, such as [the] plaintiff's credibility."  *Osley v. Comm'r of Soc. Sec.*, 2013 WL 3456963, at *8 (E.D. Mich., July 9, 2013) (citing *Adams v. Comm'r of Soc. Sec.*, 2011 WL 2650688, at *1 (W.D. Mich. July 6, 2011)).  Here, the ALJ relied on the plaintiff's criminal record as only one factor in her credibility finding.  (Tr. 19.)

concludes that the ALJ properly weighed the evidence in the record and did not err in determining that the plaintiff's allegations of disability were not fully credible. The ALJ's decision indicates that she complied with the *Duncan* test and 20 C.F.R. § 404.1529(c) in evaluating the plaintiff's credibility regarding his subjective complaints of pain.

## V. RECOMMENDATION

For the above stated reasons, it is recommended that the plaintiff's motion for judgment on the record (Docket Entry No. 13) be DENIED and the Commissioner's decision be AFFIRMED.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report and Recommendation, and must state with particularity the specific portions of this Report and Recommendation to which the objection is made. Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's Order regarding the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

JULIET GRIFFIN
United States Magistrate Judge